United States District Court
Southern District of Indiana
Indianapolis Division

**Richard Watkins**,

        Plaintiff,

   v.

**Trans Union, LLC**,

        Defendant.

2:14-cv-135-JMS-WGH

## Response to Order to Show Cause

This court has ordered that Plaintiff's counsel show cause as to why he should not be disqualified from representing Plaintiff against Defendant pursuant to Indiana Rule of Professional Conduct 1.9 and the rationale set forth in the *Childress*[1] and *Hobson*[2] orders regarding Cento's disqualification from those two cases.

This is an individual action brought by Richard Watkins ("Watkins") against Trans Union, LLC ("TU") seeking damages under the Fair Credit Reporting Act ("FCRA").[3] Watkins is represented by G. John Cento ("Cento"), an attorney admitted to practice law before this Court. TU has asked this court to disqualify Cento based upon the rulings in Childress and Hobson and claiming that his knowledge from ten years and more ago when he was working as an associate under partner Robert Schuckit ("Schuckit") creates a disqualifying substantial relationship

---

[1] *Childress v. Trans Union, LLC*, 2012 WL 6728339 (S.D. Ind. 2012), Order on Motion to Disqualify Counsel and Related Matters, Dkt. 40 (the "Childress Order"); and *Childress v. Trans Union, LLC*, 2013 1828050 (S.D. Ind. 2013), Entry on Objection to Magistrate Judge's Order, Dkt. 71 (the "Childress Order Overruling Objection").

[2] *Hobson v. Trans Union, LLC*, 1:13-cv-00054, (N.D. Ind. 2013), Order, Dkt. 63 (the "Hobson Order").

[3] 15 U.S.C. 1681, et seq.

1

between this case and those past representations. For the reason set forth here, Cento should not be disqualified.

## I.      Factual Background

Years ago, Cento worked as an associate for two law firms, Katz & Korin, P.C. ("K&K") and, briefly, Schuckit & Associates, P.C., ("S&A") that handled legal matters for TU. According to Schuckit, Cento himself began handling many TU matters during the course of his employment with those law firms beginning in 2003.[4] Cento last did legal work for TU while he was an S&A associate until July of 2005[5] - almost ten years ago.

While at K&K and S&A, Cento handled diverse matters for TU, mostly defense of FCRA cases, including a small number of mixed-file cases. But TU has misrepresented the true nature of his role as a lawyer for TU on discrete FCRA cases in both *Childress* and *Hobson*. In his affidavit filed in support of his position on disqualification in *Hobson*,[6] Cento created a full and accurate context for his representation of TU almost a decade ago. It was and remains a dramatically different picture from TU's highly generalized and inaccurate portrayal of Cento as being perceived as an extension of TU's in-house legal department. Of course, this has always been a self- serving portrayal by TU, but TU's portrayal of how it viewed Cento some ten years ago is hardly a substitute for the required rigorous application of the substantial relationship test.

Cento was not unaware of the fact that his work for TU might place some ethical limitations on his ability to be adverse to TU in the future. For seven years, out of respect for TU

---

[4] Schuckit Affidavit, Ex. C to TU Disqualification Motion in Hobson, at ¶ 3.

[5] *Id.*

[6] Cento Affidavit filed in Hobson as Dkt. 36 (the "**Cento Aff.**"), a copy of which is attached hereto as **Exhibit 1**; *see also*, Cento Affidavit filed in Childress, attached hereto as **Exhibit 2**.

2

and in compliance with his ethical duties to TU as a former client, he focused his legal activities following his last representation of TU on matters other than FCRA cases against TU.[7]

While Cento handled a number of matters for TU in past years, he had never been described as an extension of TU's legal department.[8] Among other things, he did not have access to its internal computer systems, independent settlement authority, or unfettered access to internal TU in-house counsel communications.[9] Like many lawyers are, for an interval of approximately two years, he was outside counsel for an institutional client acting under the supervision of a partner who was in charge of the client relationship. Nothing more and nothing less.[10]

Cento was not alone in providing associate support to Schuckit in his representation of TU. Other associates did so, too.[11] Cento was more experienced in handling these matters and played a somewhat greater role than other associates, but he remained an associate and Schuckit was always the partner who had the relationship with TU.[12]

The characterization of Cento's representation of TU in both *Childress* and *Hobson* was dramatically exaggerated. In his affidavit submitted in *Hobson*, Cento described in great detail the research he has conducted on PACER that demonstrates the more modest, case-by-case role he played as a former outside counsel for TU.[13] Cento had little direct contact with the in-house

_____

[7] Cento Aff. at ¶'s 1 and 2.

[8] Cento Aff. at ¶ 8.

[9] Cento Aff. at ¶ 9.

[10] *Id*.

[11] Cento Aff. at ¶ 15.

[12] Cento Aff. at ¶ 16-22.

[13]

counsel mentioned in the Schuckit and Norgle affidavits submitted in the *Childress* and *Hobson* cases. His first and primary point of contact was with a TU in-house attorney who was responsible for FCRA cases, Patricia Norris.[14] Norris is no longer employed by TU.[15] Throughout Cento's representation of TU, it was Norris, not the other TU lawyers mentioned, who acted as the gatekeeper and managed FCRA litigation that Cento handled for TU.[16] The other lawyers rarely became involved.[17] Cento appeared for TU as counsel of record in only 83 FCRA cases.[18] His role was relatively limited in many of them, and in a few of them, his representation was just beginning when Schuckit discharge him as an associate with S&A.[19]

Cento handled the defense of FCRA cases for TU on a case-by-case basis. He was not TU's sole counsel. He was not engaged by TU to represent it on an institution-wide basis on FCRA cases. He was assigned by Schuckit to defend particular FCRA cases against TU and he handled those cases, all via settlement and none were tried to judgment.[20] Those cases were settled on the basis of the facts of those cases, including the facts pertaining to liability and the facts pertaining to damages, and on the basis of Cento's knowledge of how those facts would create liability and damages exposure to TU under the FCRA. His knowledge of the facts pertinent to those cases would, of course, have been information relating to his representation of TU, but those facts related to other consumer cases, not to Watkins'. His knowledge of the FCRA

---

[14] Cento Aff. at ¶ 22-25.

[15] Cento Aff. at ¶ 37.

[16] Cento Aff. at ¶ at 22-38.

[17] Cento Aff. at ¶ 26 and29-31.

[18] Cento Aff. at ¶ 69.

[19] Cento Aff. at ¶'s 71.

[20] Cento Aff. at ¶ 40.

is knowledge of the law. The law is not a client confidence. The facts of the FCRA cases Cento handled for TU ten years ago are not relevant to this case.[21]

In an attempt to overcome the irrelevance to this case of the fact that Cento represented TU in defense of other consumer FCRA claims in the rather distant past on the unique facts of those cases, TU attempted in both *Childress* and *Hobson* to build a role for Cento as having deep access to its strategic thinking that is simply counter-factual. Cento handled each case on its merits.[22] There was no over-arching litigation strategy that was in any way unique to TU.[23] Cento's knowledge of TU's approach to litigation was no more secret than any outside litigator's knowledge of other clients' approach to litigation: do not pay money to settle cases that have no factual or legal merit; settle cases for as little money as possible. If this is disqualifying client information, it would be information known by every lawyer representing every client, whether in one case, 83 cases or 250 cases.[24] It is, in fact, generic information, and in neither Childress or Hobson did TU provide actual support for a claim that its litigation strategy had some secret or unique element.

As explained by Cento, what TU claims to be its confidential information is not confidential at all. Much of it is already in the public domain or falls within the standard protocol followed by all FCRA plaintiffs' counsel in conducting discovery in consumer-side FCRA cases.[25] TU's position in both *Childress* and *Hobson,* that its FCRA compliance regime is

---

[21] Cento Aff. at ¶'s 39, 133-146 and 156-158.

[22] Cento Aff. at ¶ 89.

[23] Cento Aff. at ¶'s 90, 159-160.

[24] Cento Aff. at ¶ 90-99.

[25] Cento Aff. at ¶'s 109-119.

substantially identical now to what it was when Cento last represented it in July of 2005, is both wrong and contrary to common sense. In his affidavit, Cento demonstrated how TU publicly promoted itself, not as a conservative organization resistant to change, but as being nimble and adaptive to changes in technology.[26] Moreover, it is inconceivable that a company, like TU, whose business model hinges on leveraging technology to process mass quantities of information, would remain substantially the same today as it was ten years ago.[27]

Cento explains in his affidavit the basic approach to the defense of FCRA claims.[28] Much of the information TU claimed as confidential in *Childress* and *Hobson* was and is, in fact, generally available to the entire world via the Internet at MyFairCredit.com and probably elsewhere. The relatively modest and routine universe of information that will be available via discovery to assist Watkins in making out his claim will be the product of obvious discovery in this case. It is of no value to Watkins that Cento knows (assuming he does) how TU made mistakes ten years ago in other consumers' credit records.

## II. If Rule 1.9 is properly interpreted and applied Cento should not be disqualified.[29]

Rule 1.9(a) states: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former

---

[26] Cento Aff. at ¶'s 120-127.

[27] Cento Aff. at ¶'s 128-129.

[28]

[29] By local rule, this Court has incorporated the Indiana Rules of Professional Conduct as its own professional responsibility standards. S.D.Ind.L.R. 83-5(e). We will refer to this Court's Rules of Professional Conduct throughout this response as "Rule x.x."

client gives informed consent, confirmed in writing."[30] Disqualification of a party's chosen counsel is a drastic measure and should be approached with the utmost seriousness because, as here, not only does a litigant lose his counsel of choice, but a lawyer is deprived of a professional opportunity to put his hard-earned legal skills to use in service of a client in need of them. "[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary. A disqualification of counsel, while protecting the attorney-client relationship, also serves to destroy a relationship by depriving a party of representation of their own choosing."[31] The Seventh Circuit has warned that motions to disqualify counsel "should be viewed with extreme caution for they can be misused as techniques of harassment."[32] This is not empty rhetoric, and the instant case is an example of the harassing use of a disqualification motion based on little more than speculative claims that an associate attorney who long ago worked for an institutional client on matters assigned by his supervising partner possesses residual information from the past that will have specific value to proving the merits of a client's case eight years later.

TU bears the burden of proving the facts to demonstrate that there is a disqualifying substantial relationship.[33] TU cannot meet that burden because it cannot demonstrate how any facts known to Cento by virtue of his former TU representation would be relevant to the current case.

In its prior disqualification attempts, TU has argued that Cento's representation of TU

---

[30] Rule 1.9(a).

[31] *Freeman v. Chicago Musical Instrument Exchange*, 689 F.2d 715, 721 (7th Cir. 1982).

[32] Id. at 722.

[33] *Boston Scientific Corp. v. Mirowski Family Ventures, LLC*, 2012 WL 1982114, *1 (S.D. Ind. June 1, 2012).

eight to ten years ago exposed him to information related to his representation of TU that he is ethically obliged to keep confidential. This is a truism, but an inadequate one to support disqualification—any time a lawyer represents a client, he is exposed to information he must keep confidential. Lawyers must always continue to protect their former clients' confidences unless there is former client consent or some other exception to the duty of confidentiality.[34] The mere fact that a lawyer was exposed to information while representing a client does not mean the lawyer is disqualified from ever being adverse to the client in the future. If that were the case, no lawyer could ever be adverse to a former client. But that is not the standard and that is not the law. A lawyer is only ethically precluded from being adverse to a former client when the current, adverse matter is substantially related to the past matter or matters handled by the lawyer for the now-adverse party.[35]

Put another way, in order for it to be disqualifying, the information known to the lawyer by virtue of the former representation must be relevant to the current case. Relevance is not some nebulous way of saying that the matters are vaguely alike—such as they rely on the same statutory provision to support relief. Relevance has specific meaning related to the admissibility of evidence in a particular case. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[36] Relevant evidence is admissible. Irrelevant evidence is not.[37] TU cannot demonstrate what evidence known to Cento

---

[34] *See* Rule 1.9(c).

[35] Rule 1.9(a).

[36] F.R.Evid. 401.

[37] F.R.EvId. 402.

by virtue of his past representation of it would be relevant (i.e., admissible against it) in this case. This Court is well-positioned to assess for itself whether it would allow Watkins to prove her case based on what TU did in other consumers' cases ten years ago or based on policies and procedures that were in place ten years ago. Cento respectfully suggests that if he had the audacity to attempt to prove Hobson's case taking that approach (which he wouldn't), he would fully expect to fail in getting that evidence into the record.

In theory, the duty imposed by Rule 1.9(c) to keep former client information confidential alone would suffice to protect the confidences of former clients, and lawyers would always be free to become adverse to their former clients even in substantially related cases because lawyers would not reveal or use (except as generally known) their former clients' confidences. However, this was seen as an inadequate measure because when the lawyer undertakes to represent the second client in a substantially related matter, he or she would be simultaneously ethically compelled to make use of all information helpful to the second client in derogation of the lawyer's confidentiality duty to the first client or to withhold information known from the first representation to the disadvantage of the second client—the classic irresistible force meeting the immovable object. Judge Weinfeld in *T.C. Theatre Corp.*[38] is credited with developing modern disqualification theory using the substantial relationship test as a standard for resolving the dilemma by taking the conflicted lawyer out of the mix entirely via disqualification. The substantial relationship standard did not become formally institutionalized into lawyer ethics codes until the ABA adopted the Model Rules of Professional Conduct in 1983.

Although one finds cases from time-to-time that bring considerations of loyalty to former

---

[38] *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265 (S.D.N.Y. 1953).

clients into play when discussing disqualification of lawyers based on former-client conflicts, this is not a helpful way of approaching the issue. Loyalty to clients is mostly the province of the current client conflict rule—primarily Rule 1.7. If lawyers were required to remain loyal to their former clients, they could never later oppose them, even in unrelated matters. That is not the law. The central feature of the substantial relationship test is its focus on protecting information related to past representations to the extent that the information could be used in the new case to disadvantage the former client. When courts discuss loyalty to former clients as an aspect of former-client conflict of interest analysis, it should be understood as a somewhat imprecise way of expressing the importance of the confidentiality element of loyalty that survives the attorney-client relationship in deciding disqualification motions. Untethered from considerations of protecting former client confidences, including undifferentiated references to loyalty or the "appearance of impropriety," the substantial relationship test loses its value as a reliable and disciplined vehicle for deciding when a party could be harmed because one of its former lawyers is now on the other side of a case.

Although there has always been a dramatically different portrayal between the parties of the breadth and depth of Cento's past representations of TU in *Childress* and *Hobson*, one objective fact is undisputed: Cento has not represented TU for almost ten years. "Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related."[39] In order for a finding of disqualification to have merit, TU must show much more than the fact that Cento knew information about past representations from ten years ago. It has to

---

[39] Comment [3] to Rule 1.9.

carry its burden to prove that the third part of the Seventh Circuit's three-part equation is satisfied here: that Cento's almost ten-year-old factual knowledge (which he is independently ethically required to keep confidential under Rule 1.9(c)), could be turned to Watkin's advantage and against TU now--in this particular case. It is not enough for TU to claim, as it did in *Childress* and *Hobson* and as it has essentially done here, that Cento learned about the FCRA while representing it and now must be prohibited from turning that knowledge of the law against TU. Rather, TU must show and this Court must find what facts Cento would ordinarily have known from his long-past representation of it that could be used to its disadvantage as admissible evidence in his representation of Watkins.

In *Childress* and *Hobson*, TU devoted much time and attention pointing out the number of separate matters Cento handled for TU and the hours devoted to that representation. Some of what TU claims is correct, much of it is exaggerated, and the rest of it is incorrect. Cento's extensive affidavits filed in both *Childress* and *Hobson* develop in great detail the nature and extent of his long-past representation of TU. Among other things, Cento debunked TU's careless characterization of his past representation as being an extension of its in-house legal department. Indeed, TU attempted to paint an inaccurate picture of Cento as having been uniquely embedded within TU's internal structure. As Cento's affidavits make clear, this is simply not true. Cento represented TU as a client to the best of his professional capabilities, but he was at all times outside legal counsel and had the same kind of relationship with TU that virtually all outside lawyers have with their regular institutional clients. But that ended almost ten years ago, and Cento has not been exposed to a shred of information related to a TU legal representation since July of 2005.

Beyond the mere conclusory allegation of relevance, TU failed in both Childress and Hobson to demonstrate how it could possibly be helpful to the consumers Cento sought to represent that Cento is charged with having knowledge of the details of FCRA cases generally or mixed-file cases in particular from eight or more years ago. It is understandable why TU chose to focus elsewhere: the obsolete information Cento has about TU is of no value to him in representing Childress or Hobson just as it is of no value to him in representing his current client.

TU also argued in Childress and Hobson that Cento simply knows too much about it to now be its adversary. Regardless of whether he has information from past cases that could be used to its disadvantage in the current case, it claims Cento is too well-equipped as an adversary because he somehow has the Svengali-like power to know how it thinks and strategizes about cases some ten years and significant personnel and technology changes later; and more to the point, that he could use that knowledge in some tangible way to TU's disadvantage in this case. This is "simply too weak and too slender a reed" to support disqualifying a lawyer on the substantial relationship test.[40]

## III.    The Substantial Relationship Test

### A.    No substantial relationship exists if the substantial relationship test is properly interpreted and applied.

As noted earlier, the substantial relationship test for evaluating conflicts of interest involving former clients is a creature of Rule 1.9(a) and its case law precursors. Also as noted earlier, disqualification of lawyers under the substantial relationship test is disfavored. It deprives clients of their choice of counsel and, especially in cases like this, it threatens to deprive a lawyer

---

[40] *Freeman v. Chicago Instrument Exchange*, 689 F.2d 715, 723 (7th Cir. 1982).

who worked on cases as an associate as assigned by his supervising partner of the ability to use his hard-earned knowledge of the law to assist clients and make a living.

In practice, the substantial relationship test has been incorporated into a three-step analysis that has been the long-established approach in the Seventh Circuit. The analysis does not turn on whether the lawyer actually received confidential information in the representation of the former client, for doing so would require the former client to reveal the very information that is to be protected by the substantial relationship standard. Instead, a substantial relationship exists if a "lawyer could have obtained confidential information in the first representation that would have been relevant in the second."[41] The three-step process involves three staged levels of inquiry: (1) The trial judge must reconstruct the scope of the prior legal representation. (2) It must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. (3) It must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.[42]

It will be helpful to isolate the discrete aspects of Rule 1.9 in order to better identify what is and is not in dispute in this case. (1) TU is a former Cento client. Ending almost ten years ago, Cento formerly represented TU—that point is not disputed. (2) Cento represented TU in a number of matters in defense of consumer claims under the FCRA—that basic point is not disputed, but as Cento's affidavit establishes, TU's prior characterizations of the nature and scope of these representations was wrong or exaggerated. (3) Cento now represents Watkins in this case

---

[41] *Analytica v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir. 1983).

[42] *LaSalle National Bank v. County of Lake*, 703 F.2d 252, 255-56 (7th Cir. 1983); *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labooratories, Inc.*, 607 F.2d 186, 190 (7th Cir. 1979); *Jones & Henry, Engineers, LTD v. Town of Orland, Indiana*, 942 F.Supp. 1202, 1206 (N.D.Ind. 1996).

against TU—that point is not disputed. (4) Watkins' interests in this case are materially adverse to TU's—that point is not disputed. (5) TU has not given informed consent to Cento's representation of Hobson—that point is not disputed. (6) The instant matter is not the same matter as any of the matters Cento previously handled for TU—TU cannot contend otherwise. (7) Whether the instant "matter" is "substantially related" to one or more matters Cento previously handled for TU is the primary point of dispute related to TU's disqualification motion. Thus, the point of dispute here is whether this case is substantially related to the past cases Cento handled for TU almost ten years ago. This includes the requirement that his knowledge from those past representations be relevant to (i.e., admissible in) Watkins' case against TU.

To understand the point of dispute, it is first important to understand what a "matter" is. For Rule 1.9 purposes, it is defined in Comment [2] to that rule:

> The scope of a "matter" for purposes of this Rule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited. On the other hand, *a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client....* The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

(Emphasis added.)

TU cannot possibly identify a single "matter" or group of matters in which Cento previously represented TU that it show are substantially related to the instant matter. Instead, TU can only rely (as it did in *Childress* and *Hobson*) solely on vague generalities about the general nature of long-finished, unspecified representations by Cento of TU in defending it against cases

14

brought under the FCRA seeking relief under the two statutory provisions Watkins relies upon. More specifically, TU cannot explain what Cento could possibly have known about defending mixed-file cases as a result of an identified case or cases that could be relevant to his representation of Watkins.

In his affidavits[43] Schuckit identified, in non- specific terms, a two year period of time ending eight years ago (2003 until July 2005) when Cento worked as one of several lawyers "almost exclusively" on FCRA cases for TU. He claimed that in connection with an unspecified number of cases, Cento had access to TU information dealing with "(a) failure to maintain reasonable procedures to assure maximum possible accuracy of the information [TU] included in consumer reports, FCRA § 1681e(b) ('reasonable procedures' cases); and (b) failure to conduct reasonable investigations of the completeness or accuracy of information in consumer's files upon dispute by the consumer, FCRA § 1681i ('reinvestigation' cases)." Schuckit went on to claim (correctly) that TU's compliance with FCRA § 1681e(b) and FCRA § 1681i are issues in this case. What Schuckit did not do was point to even one case from eight or more years ago where he claimed there was a substantial factual relationship with the issues in Hobson. The same is true here. The mere fact that the statutory sections that lend support for Watkins' case are the same statutes as were in issue in the earlier TU cases is not enough. In her affidavits,[44] Denise Norgle of TU provided a similar affidavit, albeit at an even higher level of generality.

TU's efforts to disqualify Cento in Childress and Hobson fell precisely within the Rule 1.9 carve-out for a lawyer who "recurrently handled a type of problem for a former client," by

---

[43] Exhibit C to TU's disqualification motion in *Hobson*, attached hereto as **Exhibit 3**. See also, Schuckit Affidavit in Childress, attached hereto as **Exhibit 4**; and Second Schuckit Affidavit in Childress, attached hereto as **Exhibit 5**.

[44] Norgle Affidavit in *Hobson,* attached hereto as **Exhibit 6**; and Norgle Affidavit in Childress, attached hereto as **Exhibit 7**.

virtue of which he "is not precluded from later representing another client in a factual distinct problem of that type even though the subsequent representation involves a position adverse to the prior client."[45]

TU's approach to seeking Cento's disqualification has always avoided the discipline and rigor required in applying the substantial relationship test. As the party with the burden of proof, TU punted on shouldering that burden, relying instead on the vague notion that Cento is "The Man Who Knew Too Much" and must be eliminated from these cases with the result that his clients would be deprived of their counsel of choice and he would be deprived of an important part of his livelihood and potentially kept off-limits as a lawyer of choice for other consumers whose FCRA rights have been violated by TU.

The Court must keep in mind that Cento worked for TU because Schuckit, the partner who assigned him work, enlisted him to do TU work. Under the structure of our professional conduct rules, there are necessarily opportunity costs associated with representing any client. A key opportunity cost is the inability to be adverse to a client in the future on a substantially related matter. In a rational economic market, those opportunity costs will be priced in to the cost of legal services. As a law firm associate, Cento was powerless to adjust his compensation to account for the fact that fact that eight years after last representing TU, his former client, aided by the partner who used to assign him work and who terminated his employment (and hence, his representation of TU) would take unforeseen and extraordinary measures designed to effectively keep him from ever being adverse to it again.

It would, perhaps, be one thing for Schuckit, the billing partner who controlled the

---

[45] Comment [2] to Rule 1.9.

relationship with TU, including the pricing of legal services, and who profited from the work he assigned to Cento, to remain off limits to TU adversity well after his relationship ends. It is another thing entirely for, as is the case here, Schuckit to entice Cento to a new law firm, promptly discard him as an associate, then seven years after Cento took a self-imposed time-out from being adverse to TU, assist his client to keep Cento from earning a living in an area of law practice where he has expertise. It is a cynical and improper use of Rule 1.9 to wield it as a cudgel to punish law firm associates who have the audacity to take their knowledge of the law with them to serve future clients many years later in cases that have no substantial factual overlap, but merely share common legal issues.

The substantial relationship test takes account of the fact that lawyers must be loyal to their current clients, but they are not enslaved to them by bonds of continuing loyalty after the lawyer-client relationship ceases so long as they protect former client their former client's confidences. It was not lost on the drafters of the Rules of Professional Conduct that they are to be interpreted as "rules of reason" (Rules of Professional Conduct, Preamble at ¶ [14]) and must be interpreted reasonably so as not to unfairly deprive clients of their right to choose counsel and lawyers of the right to make a living.

The "Man Who Knew Too Much" theory of disqualification is not supported by Rule 1.9. It is, instead, TU's take on former-client conflicts of interest that flies directly in the face of this Court's own professional conduct standards: "On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation

involves a position adverse to the prior client."[46] More to the point in the case of former

organizational clients, this Court's professional conduct standards recognize the weakness of any

appeal to such mystical notions of settlement philosophy or general approach to litigation: "In

the case of an organizational client, general knowledge of the client's policies and practices

ordinarily will not preclude a subsequent representation; on the other hand, knowledge of

specific facts gained in a prior representation that are relevant to the matter in question will

ordinarily preclude such a representation."[47]

     TU has argued and presumably continues to argue that over the course of multiple

representations of TU, Cento learned TU's "playbook" for defending FCRA cases. The so-called

"playbook" theory of former-client conflicts of interest takes its name from the work of the

leading commentator on the topic of former-client conflicts of interest, Prof. Charles W.

Wolfram. Prof. Wolfram was the chief reporter of the American Law Institute's Restatement of

the Law Governing Layers. His seminal work on former-client conflicts is: Former-Client

Conflicts, 10 Georgetown J. Legal Ethics 677 (1996-97). The idea that a lawyer who represented

a client on multiple matters should not be allowed to later sue that same client in cases raising the

same legal, but not factual, issues is facially attractive, but it readily breaks down on more

careful examination to be a misplaced consideration of loyalty to former clients, not protection of

their confidences. Here is what Prof. Wolfram said about playbook conflicts claims:

> One persistently problematical variation on the question of what counsel as a "matter"
> when attempting to determine the subject of the earlier representation has involved the
> 'playbook' problem – a claim by a former client that the lawyer learned confidential
> information of a very general kind. Common variants on the claim are assertions that

---

[46] Rule 1.9, Comment [2].

[47] Rule 1.9, Comment [3].

the lawyer learned the former client's settlement strategy and philosophy, or what sequence of demands or other client's settlement strategy and philosophy, or what sequence of demands or other tactics the former client uses in negotiating business deals, how the client deals with the stresses of litigation, what quirks of personality the client possesses or suffers from, or, in general, what "hot buttons" can be pushed to cause panic or confusion to the former client. Confidential information about any one of those elements, it is claimed, would give the lawyer signficant advantage if it were permissible to represent an adversary against the former client, regardless of factual dissimilarities between the two representations in other respects. Hence, it is claimed, confidential information protected by the substantial relationship should include such playbook information.[48]

Prof. Wolfram rejects the idea that playbook information could, standing alone, be disqualifying. While the claims have a ring of surface plausibility, at least in some representations, the considerations that drive them, if generalized, would require a rule very much like the opposite of the rule that a lawyer is free to proceed adversely to a former client unless a substantial relationship is shown. Such playbook information would, presumably, equally benefit the new client in any sort of proceeding, whether (otherwise) substantially related or not. That would portend both over-application of the substantial relationship test and a large increase in the number of motions to disqualify.[49]

In trying to make a case for a substantial relationship, TU asserted and the Childress and Hobson courts found that TU's system procedures and capabilities remain substantially the same now as they were when Cento last did legal work for TU in 2005. Cento's affidavit directly addresses these points and demonstrates that this is a wholly inaccurate characterization.

First, Schuckit is an outside lawyer for TU, and an advocate, at that, who, as lawyers are supposed to, is acting in his clients' interests. He does not purport to be an expert on information

---

[48] *Id.* at 723.

[49] *Id.*

technology. Simply put, he is not a competent source of information about TU's system procedures and capabilities. At best, his statements lack first hand knowledge. Second, his statements are wrong and entirely self-serving to his client's interests. Credit reporting is fundamentally a process of collecting data from data furnishers (retailers, lenders, etc.), verifying the data's accuracy, assembling the data and reporting it out. It is a technology- leveraged process that relies on computers to gather, verify, assemble and report information. TU would have this Court believe that nothing of substance has changed in a system that is computer software-driven since July of 2005. This is an inherently incredible claim.[50]

It is further counterintuitive and incredible that TU would use substantially the same system procedures and capabilities in 2015 as in 2005 because TU has powerful incentives to continually improve its product for competitive reasons and because it is a highly regulated business that is compelled to constantly improve its product in order to avoid liability under the Fair Credit Reporting Act, and in particular, the FCRA's requirement that it "follow reasonable procedures to assure maximum possible accuracy of the information" it includes in consumer reports.[51]

This Court's Rules of Professional Conduct specifically acknowledge that passage of time is a relevant consideration in determining whether there is a substantial relationship.

---

[50] In 2005 Facebook barely existed. *See* Facebook expanded for the first time outside of use limited to students at Harvard University in October of 2005. http://en.wikipedia.org/wiki/History_of_Facebook. In 2005, the smart phone was a dream, not a reality. *See* The first Apple iPhone was introduced in 2008. http://apple-history.com/iphone. 6 According to Wikipedia, Version 13.0 was skipped due to superstition. Adobe Acrobat, a popular program for creating documents in portable document format (PDF) was available in Version 7.0 in 2005. Focusing only on major version revisions, it released Version 8.0 in November of 2006, Version 9.0 in July 2008, Version 10.0 in November of 2010, Version 11.0 in October of 2012. *See* wikipedia.org/wiki/Adobe_Acrobat. Again focusing only on major revisions, in 2005, Microsoft Word for Windows, a popular word processing program, was available in Version 10.0 in 2005. Version 11.0 was released in 2003, Version 12.0 was released in 2006, Version 14.0 was released in 2010,6 and Version 15.0 was released in 2013.

[51] 15 U.S.C. § 1681e(b).

"Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related." Rule 1.9, Comment [3]. In the case of a client business that is almost entirely technology driven, it is hard to imagine another context in which passage of time is more relevant to the substantial relationship analysis. In terms of computer- based technological change, eight years is a virtual lifetime.

It is immaterial to this case, let alone substantially related, that TU mixed files of other consumers more than ten years before they did so with Watkins. It is of no possible benefit to Watkins' case, let alone admissible evidence, that TU made mistakes in other consumer's cases almost ten years before it made a mistake in Watkins' case.

Watkins alleges that TU failed to handle the errors it made with respect to his (not someone else's) credit report in conformity with the requirements of the FCRA. It is immaterial to Watkins' claim that TU failed to properly handle reporting errors with regard to other consumers almost ten ago. Similarly, Watkins alleges that TU failed to conduct a reinvestigation that complies with the FCRA. It is of literally no use to Watkins in proving that TU failed in its reinvestigation duties in his case to demonstrate that TU made similar errors related to other consumers ten years ago.

TU claimed in Hobson that TU uses internal procedures regarding the processing of information, including algorithms and database rules to match information from creditors with consumer credit files. This is, once again, a simple truism and relies not at all on Cento's access to TU information from ten years ago. The Court should take particular note of the corresponding allegations in Watkins' Complaint. It is a present tense allegation about TU's

internal procedures now or at the time it issued a flawed credit report for Watkins. It would be absurd to expect that Watkins could meet his burden of proof in this case by proving what TU would have done in reinvestigating his case had it messed up his credit report ten years ago. The absurdity of it is self-evident to the point where Watkins would never rely on ten-year out-of-date evidence as proof of what happened here. Indeed, this Court would never let the evidence be admitted.

Returning to the key idea that the purpose of the substantial relationship test is to protect former client confidences, the rationale for disqualification evaporates if there are not confidences of substance to be protected. Once again, the comments to this Court's Rule 1.9 address the situation. "Information that has been disclosed to the pubic or to other parties adverse to the former client ordinarily will not be disqualifying."[52] In his affidavits, Cento explained at great length how there is a well established bar of FCRA plaintiffs counsel who are every bit as knowledgeable as Cento or more so about the policies and procedures used by TU in collecting and reporting consumer information. Moreover, it is not just information known to some elite group of lawyers, it is spread all over the Internet.

The Northern District has previously considered the allegedly disqualifying nature of information known to a lawyer who is alleged to be the reason disqualification is required and stated that it cuts against disqualification if "all matters of relevance were already matters of public record."[53] Setting aside entirely that Cento's knowledge is almost ten years old and applicable to other consumers, not Watkins, what he might know is the routine details of how

---

[52] Comment [3] to Rule 1.9.

[53] *Town of Orland*, 942 F.Supp. 1202, 1209 (N.D. Ind. 1996).

one conducts the obvious discovery in FCRA cases to seek information (or Watkins' equivalence of information) that is already in the public realm.

**B.**     **The newly discovered evidence in this case reveals TU's many misrepresentations, conclusively proves that TU has no credibility when it comes to the facts relevant to the Court's inquiry and undermines entirely the foundation of both the *Childress* and *Hobson* rulings.**

This Court now has for the second time indisputable evidence of TU's lack of credibility on any of the pertinent factual statements which formed the basis of the rulings in Childress and Hobson.

"Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related."[54] Cento has not represented TU since July 2005. Cento filed Childress in February 2012. At the time Childress was filed it had been almost seven years since Cento represented TU. Cento filed Hobson in February 2013. At the time Hobson was filed it had been almost eight years since Cento represented TU. Cento filed this case in May 2014. At the time this case was filed it had been almost nine years since Cento represented TU. And it has now been almost ten years since Cento represented TU.

In Childress, this Court found that:

...[T]he primary fact that militates [sic.] against a finding of substantial relationship is the passage of time. Seven years have passed since Mr. Cento represented TU. Even with representations extensive in scope, at some point, the changes that normally accompany the passage of time - shifts in key personnel, corporate philosophy, or business focus- may render whatever the lawyer learned in the course of that prior representation irrelevant.

At the time of the Childress ruling, Cento had already shown and this Court already knew that

---

[54] Comment [3] to Rule 1.9.

Cento's primary contact and "key personnel" at TU, Patricia Norris, was terminated by TU in 2011. We also knew that TU did not reveal that Ms. Norris had been terminated during the Childress litigation and that TU misrepresented to the Court during oral argument and through Mr. Schuckit's affidavit that key personnel had remained unchanged despite the Norris termination.

At the start of this case, Cento asked this Court to permit him to determine through limited discovery what else has changed at TU since July 2005. This was and remains a particularly relevant question since TU has chosen to pursue disqualification in this case without submitting any evidence. Specifically, TU has not submitted any evidence regarding any of the issues and alleged facts discussed below.

According to TU's conclusory and self-serving statements submitted in both Childress and Hobson nothing has changed and its policies, procedures and strategies remained "substantially the same" in 2012 and 2013 as they were in 2005. It has now been almost ten years since Cento last represented TU. Cento tried in *Childress* and *Hobson*, without the benefit of discovery, to show that these policies, procedures and strategies (even if they are presumed to exist - a fact which Cento vigorously disputes and a fact which was presumed to be true in both *Childress* and *Hobson*) must have changed over these many years. This is of course a virtually impossible task since Cento is not privy to the inner workings at TU or to its personnel file. It is especially difficult since TU appears ready and willing to keep pertinent information (like it did with the termination of Ms. Norris) from the court.

Policies, procedures and strategies (if they exist at all) at a large multi-national corporation like TU are of course the function of many factors including experience, corporate

philosophy, corporate morality, corporate financial conditions, corporate goals and missions and, as this court has already pointed out, corporate personnel. Surely TU has experienced change in some or all of these areas during the past nine years.

These policies, procedures and strategies are also certainly influenced by changes in credit reporting law, new court rulings interpreting those laws and the years of credit reporting litigation TU has experienced over the past nine years - experience which includes litigating literally thousands of FCRA cases. Yet, Cento has been continually prohibited from discovering or challenging any of this information. Instead, this court and the court in Hobson were satisfied to simply take TU's word for it. TU claims these things have "remained substantially the same" and have remained "unchanged" and those assertions are believed and accepted. They were accepted expressly by this court's *Childress* Order and that acceptance was subsequently relied upon in *Hobson*.

In fact, the court in *Hobson* made no independent analysis of the time factor (even though another year had passed) and instead relied completely upon this court's conclusion in *Childress*. The *Hobson* court of course did this after (like this court did in *Childress*) denying Cento the opportunity to cross examine TU's witnesses on this issue.

The burden of proving a substantial relationship is on TU. In order to prove a substantial relationship, TU must confront and deal with the time factor set forth in Rule 1.9. However, TU has been permitted both in *Childress* and in *Hobson* to meet that burden with self-serving and conclusory assertions made by witnesses who have never been subject to cross examination. Cento has been unfairly denied the basic right to test the veracity and the sufficiency of the evidence relied upon by the court through discovery and cross examination; basic rights afforded

25

to virtually all litigants in virtually all circumstances.

Particularly relevant here are several particular alleged facts disclosed by the affidavits submitted by TU in *Childress* and *Hobson*:

(a)     That TU has confidential policies and procedures;

(b)     That TU has confidential litigation and settlement strategies;

(c)     That Cento knows these confidential policies, procedures and strategies; and

(d)     That those policies, procedures and strategies have remained substantially the same and unchanged since July 2005.

**1.     TU's alleged confidential litigation and settlement strategies do not exist.**

Cento has always denied and continues to deny that any of those facts are true even though he has been prevented from obtaining the evidence needed to support his denial. Cento maintains here, as he did in *Childress* and *Hobson*, that the confidential information and strategies all of which are said to remain "substantially the same" seven to nine years later and which form the basis of the disqualification arguments; either do not exist, refer to something so known by FCRA attorneys as to render them irrelevant and/or have in fact changed. However, Cento has been prohibited from contesting these findings and arguments. Cento has been refused discovery and evidentiary hearings in Childress and Hobson. Even in the face of blatant misrepresentations by TU regarding its in-house counsel, Cento has been denied the ability to conduct even a single deposition to prove his case. These rulings even went so far as to permit TU the benefit of accepting alleged proof that the confidences existed and were known while at the same time expressly disregarding Cento's only permitted evidence to the contrary - his own testimony. All that in spite of the fact that the moving party bears the burden here. The stated

reasons for these refusals relate to a concern to protect a client's confidential information. Not only is this circular logic (if the confidences and strategies do not exist as Cento maintains, then there is nothing to protect), it is a clear violation of Cento's due process rights. There is no fairness in refusing to allow a person to prove his or her case through available evidence or refusing to allow an accused to confront his accuser.

Yes, a client's confidences should be protected. But, not at all costs. This is especially true when a court's ruling will substantially impact a person's right to liberty or property, as is the case here and when, as here, those confidences (even if we assume they exist) could be adequately protected. The attorneys on both sides of this case can be presumed to know these alleged confidences and strategies. The only party to the case who does not know them is the Plaintiff. But, information can be protected by protective order even from the eyes of a party and can be presented to the Court under seal. If the alleged confidences are discovered between counsel who supposedly already known them then there is no disclosure which needs to be protected. In other words, the client would not be disclosing confidences and strategies; they are already known by both sides.

This Court finally permitted Cento to conduct some limited discovery on some of these issues. Specifically, the Court allowed Cento to depose TU's in-house counsel, Denise Norgle, on a number of designated deposition topics. While those topics were not as broad as Cento requested, Norgle's responses have finally revealed more of TU's misrepresentations.

TU was able to convince the courts in both Childress and Hobson that there was some sort of litigation playbook that Cento knew and that he could use to TU's disadvantage in these cases. Cento has always denied the existence of such a playbook but the courts have thus far

27

decided to take TU's word over Cento's on this contested issue. Norgle's testimony reveals not only that no such playbook exists but that TU lied in both Childress and Hobson when it affirmatively stated that its playbook remains unchanged since 2005.

Norgle admitted that TU does not possess any written instructions or manuals related to the  manner in which outside counsel conduct litigation activities.[55] Since those instructions or manuals do not exist it was a blatant misrepresentation for TU to state in Childress and Hobson that they have remained unchanged since 2005. To the extent TU intends to argue now that the instructions about conducting litigation activities somehow exist as verbal instead of written instructions, TU should not be believed. Cento certainly denies that any such strategies every existed. TU has proved itself to be unreliable when it comes to this fact and others; as discussed above and below. Because TU carries the burden on these issues and because TU has lied about these issues and others, the Court should properly find that TU has failed to prove that any such litigation strategies exist. Furthermore, since the existence of these alleged litigation strategies formed the foundation of the opinions in both Childress and Hobson, those opinions should be disregarded entirely for this reason alone.

Now, Norgle did try to identify some documents in her deposition but those documents were all various TU operational manuals. Not a single manual identified by Norgle is something that cannot be discovered in any FCRA case if that document happens to be relevant to a consumer's particular claim - not one. While it may be that for ease of discovery manuals such as those would be produced subject to protective orders, the manuals would nonetheless be produced. That means the manuals could be produced to any attorney representing any consumer

---

[55] Transcript of the deposition of Denise Norgle ("Norgle Dep."), 11:09-14:10, a copy of which has been filed under seal contemporaneously with this response as as **Exhibit 8**.

- including Cento. Finally, to the extent it matters whether those manuals have remained "substantially the same" since 2005 as Norgle and Schuckit have testified, the unreliability of that testimony was laid bare by Norgle.

Norgle testified that there are literally hundreds of operations manuals and that she is not familiar with the details of most of them. For most she cannot even recall the name of the manual.[56] Most importantly, Norgle admitted two very important points about those manuals: (1) they have changed as a result of litigation;[57] and (2) she never reviewed them for changes in connection with submitting her affidavits in Childress or Hobson or prior to giving her testimony in this case.[58] In essence what Norgle is saying is that she reviews operations manuals when changes are made during the normal course of business and has done that type of review for years. The idea that she could testify in 2012, 2013 or now about changes that were made to manuals going back over a decade is preposterous. There is simply no way her testimony can be considered reliable on this point. And, Schuckit's testimony on this point is even more absurd and unreliable since he does not even claim to have reviewed all of these hundreds of manuals.

These manuals are all subject to discovery, so they should not factor into any analysis being done by the court now. However, to the extent the court considers them in any way, the court should disregard TU's contention that the manuals remain substantially unchanged.

Finally, since these alleged facts added to the foundation of the opinions in both Childress and Hobson, Norgle's testimony proves that both opinions are defective and should not be followed here.

---

[56] *See* Norgle Dep., 25:10-57:21.

[57] Norgle Dep., 59:4-60:3.

[58] Norgle Dep., 60:5-61:13.

2.      **TU's key personnel have substantially changed.**

There were two persons within TU with whom Cento worked the most and who made most of the decisions related to the cases which Cento handled for TU - Patricia Norris and Eileen Little. Both of those persons are gone. Not only are those persons no longer with TU, neither of them was with TU at the time *Childress* was decided. TU tried but failed to hide that Patricia Norris was no longer employed. Unfortunately, TU was successful in hiding that Eileen Little was both no longer employed by TU but was also deceased at the time *Childress* was filed and decided.

Norgle was asked to identify the TU employees anticipated to have relevant information related to Watkins' claims. Because Cento knows that Little was always involved in these cases and almost always served as TU's corporate witness on consumer dispute matters, Cento was surprised when Norgle did not identify Little as one of those employees. Inquiring further Cento learned for the first time that Little was no longer with TU because Little had died at some point.[59] Nor surprisingly, Norgle pretended not to know exactly when Little died.[60] Of course, this is not a fact which TU can actually hide like so many others. A simple internet search revealed that Little died in April 2011.[61]

TU filed its motion to disqualify Cento in Childress in April 2012 - one year after Little's death. TU filed its motion to disqualify Cento in Hobson in April 2013 - two years after Little's death. In support of its motions to disqualify in Childress and Hobson, TU submitted affidavits by Robert Schuckit. The Court also held oral argument in Childress which was attended by

---

[59] Norgle Dep., 8:3-19.

[60] *Id.*

[61] Obituary of Eileen Little, attached hereto as **Exhibit 9**.

William Brown. The affidavit submitted by Robert Schuckit in support of TU's motion to disqualify in Childress emphasized that, despite the passage of time, the key personnel at TU with whom Cento worked had not changed.

Specifically, Magistrate Judge Lynch stated in pertinent part that "[I]n response to the court's question at oral argument,[62] TU emphasized that, despite the passage of time, the key personnel had not changed. Mr. Schuckit's affidavit sounds a similar theme. If Mr. Cento's new filing is correct, that assertion was not entirely accurate and should have been corrected." At no time prior to Norgle's deposition in this case did TU ever revealed Little's death. TU did not reveal the fact of Little's death when it submitted the sworn testimony of Robert Schuckit and counsel Brown did not reveal her death in response to the judge's specific inquiry on this very subject at the Childress oral argument.

Even after being admonished by Magistrate Judge Lynch for not having revealed Patricia Norris' firing, neither Schuckit or Brown came forward to confess that Eileen Little had died. TU should have but did not correct the record about Little. Instead, Schuckit and Brown remained silent about an issue expressly important to this Court's analysis and allowed the perception to exist that TU's key personnel remained substantially the same since Cento represented TU in 2005. As mentioned above, Magistrate Judge Lynch specifically found that Norris' firing was "not enough to alter the fact that Mr. Cento was privy to confidential communications and strategies that transcend the 'day-to-day.'"

While Norris' firing was not have been enough for the Court in *Childress*, Norris' firing combined with Little's death might have been enough. Unfortunately, we will never know

---

[62] Transcript of Hearing in Childress, attached hereto as **Exhibit 10**.

because TU hid that critical information from the Court and has continued to hide it through the briefing in Hobson and to this day. However, this Court is now in a position to properly and fully consider the impact both of Little's death on the substantial relationship test and of TU's obvious attempt to hide her death on TU's credibility.

For all of the foregoing reasons, there is no substantial relationship present in this case that would support disqualification because whatever non-Watkins-specific information is known to Cento about TU is obsolete, irrelevant, and known to the public and to other opposing counsel already.

## IV.   This Court is not bound by the ruling in *Childress* or *Hobson.*

In *Childress*, Magistrate Judge Lynch ordered Cento disqualified in his representation of *Childress*.[63] *Childress* is not controlling authority here and *Childress* is also not persuasive. Magistrate Judge Lynch reached the correct conclusion that "[if] the court simply compared the nature of the facts alleged in this case to the facts at issue in any particular case Mr. Cento defended for TU, it would likely not find a substantial relationship.[64] After reaching that conclusion, and relying on *Battagliola*,[65] an unreported Southern District of New York case also cited by *Hobson*, Magistrate Judge Lynch went on to make findings about the nature of Cento's relationship with TU that transcended the facts of any given case.[66] Relying on factual findings that key TU personnel remained the same and that "most of its policies and procedures have remained substantially the same" [Id. at *15], she concluded very generally that Cento's former

---

[63] On April 30, 2013, District Judge Pratt denied the objection to Magistrate Judge Lynch's disqualification order on grounds that it was not clearly erroneous or contrary to law.

[64] *Id.* at *14.

[65] *Battagliola v. National Life Insurance*, 2005 U.S. Dist. LEXIS 650, 2005 WL 101353 (S.D.N.Y. Jan. 19, 2005).

[66] Id. at *15.

representation of TU was substantially related to the Childress case. In reaching that conclusion, Magistrate Judge Lynch relied on a factual record that was not developed in the same way or to the same extent as the record before the Court in *Hobson* and, especially as developed before the Court in this case. Among other things, there was no contrary evidence to contradict the conclusion that Cento was an extension of TU's in-house legal department or that its policies and procedures remained substantially the same.

Magistrate Judge Lynch gave short shrift, if any attention at all, to the commentary to this Court's Rule 1.9, which discredits the view that recurrent representation of clients in similar types of matters are not preclusive of a later adverse representation that is factually distinct.[67] To bolster the *Childress* Court's reliance on *Battagliola*, TU presented additional unreported Southern District of New York cases in *Hobson* that relied on the breadth of a past relationship with a client as a relevant consideration in disqualifying a lawyer who later represents an adverse party. Those cases are readily distinguishable. In both *Lott*,[68] and *Mitchell*,[69] the lawyer who was the cause of the disqualification had worked for his or her prior firm representing the now-adverse party and moved directly from his own firm to a firm representing the adverse party. The time lapse between representations was a matter of a few weeks or months, not almost ten years as is present in this case. These cases do not support TU's position, but detract from it because in this case Cento is acting adverse to his former client from a distance of ten years.

## V.   There is no pending motion or entered order in this case upon which to base a show cause order.

---

[67] Comment [2] to Rule 1.9.

[68] *Lott v. Morgan Stanley Dean Witter & Co.*, 2004 U.S. Dist. LEXIS 25682 (S.D.N.Y. Dec. 23, 2004).

[69] *Mitchell v. Metropolitan Life Insurance Company, Inc.*, 2002 U.S. Dist. LEXIS 4675 (S.D.N.Y. Mar. 1, 2002).

This court's order to show cause should be satisfied for the simple reason that a show cause order is a "[c]ourt order…to appear…and present to the court such reasons and considerations as one has to offer why a *particular order*, decree, etc., should not be confirmed, take effect, be executed, or as the the case may be."[70] Here there never has been a pending motion to disqualify or order of disqualification upon which to base a show cause order. TU never moved to disqualify counsel and the Court has not ordered counsel's disqualification *in this case*. Accordingly, this Court should never have issued the show cause order in this case and that order should now be vacated for this reason alone.

## VI.   The Childress and Hobson orders on disqualification are not orders in this case and, in any event, are not final orders.

The disqualification orders in *Childress* and *Hobson* are not orders *in this case*. Those orders apply only to counsel's representations of those particular plaintiffs. There is nothing in those orders which would make them applicable to counsel's representation of Watkins or any other plaintiff.

## VII.   TU is not entitled to an award of attorney fees.

TU claims an entitlement to an award of attorney fees for bringing its Motion for Order to Show Cause, but it provides no basis in law why it is entitled to one. It points to the fact that disqualification was ordered in *Childress* and *Hobson*. Fees were not awarded to TU in either of those cases. More importantly, those cases are not controlling and do not render counsel's defense (which counsel has not yet had the opportunity to make) of any anticipated but not yet pending motion to disqualify here frivolous or otherwise sanctionable.

---

[70] Black's Law Dictionary (Sixth Edition), at 962.

*In Analytica*,[71] the Seventh Circuit considered the question of assessing fees against the party who opposed a disqualification motion to be one of whether the opposition was so unreasonable as to be in bad faith. Neither Childress nor Hobson found there to be any bad faith nor unreasonableness on counsel's part and, certainly, no such finding has been made or could possibly be made yet here since the question of disqualification has neither been heard or ruled upon.

If TU has its way, counsel, who has not represented TU since June 2005 (more than 9 years ago), will never be allowed to file a FCRA case against TU unless and until TU tells him it is safe to do so—which will, of course, be never. This is not *Childress* or *Hobson*. Disqualification must be and can only be decided on a case-by-case basis. It is not an act of bad faith to collaterally disagree with the *Childress* or *Hobson* outcomes, especially in light of the fact that counsel has no other mechanism for challenging the court's ruling in *Childress* or *Hobson* because those orders of disqualification are not appealable until there is a final, court-ordered disposition of the case adverse to counsel's former clients.

## VIII.  Certain issues relevant to disqualification must be periodically reexamined.

Even assuming for the sake of argument that the orders in *Childress* and *Hobson* could somehow be enforced here as TU wishes, there are issues related to disqualification which must by their very nature be reexamined periodically - primarily the question of the passage of time.

"Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations

---

[71] *Analytica v. NPD Research, Inc.*, 708 F.2d 1263, 1269 (7th Cir. 1983).

are substantially related."[72] *Childress* was filed in February 2012; at which point counsel had not represented TU for seven years. *Hobson* was filed in February 2013; at which point counsel had not represented TU for eight years. This case was filed in May 2014 - effectively nine years since counsel last represented TU. Since time is a factor to be considered in disqualification based upon conflict of interest that factor changes as time passes. Both *Chidless* and *Hobson* implicitly acknowledge this point. Accordingly, this Court's order to show cause should be satisfied based upon this fact alone. In bringing this case, Cento is doing nothing more than continuing to test the impact of time which this Court instructed was the main factor weighing in Cento's favor. There is simply no other way to test the impact of time.

## IX.    The balance of harms favors Watkins.

TU argued in both *Childress* and *Hobson* and presumably will do the same here that, Cento should be disqualified because there is little harm to Watkins if Cento is disqualified and significant harm to it if Cento is not disqualified. This position entirely disregards the momentous significance of a court stripping a client of her counsel of choice. Contrary to what TU has so far argued, lawyers are not fungible. An attorney-client relationship is one of trust and confidence. It is no small thing for a court to tell a client that her hand-picked client is unable to serve as her legal representative.

By contrast, TU's harm is at best hypothetical. TU has never made any effort in either of the prior cases to demonstrate how Cento's knowledge gained in past representations would be relevant to the current case in question and it will not be able to do so here. Not only does this lack of proof fail to meet TU's burden to show how that Cento's dated knowledge would be

---

[72] Comment [3] to Rule 1.9.

relevant in this case, it also creates a trivial risk that TU would experience any disadvantage were Cento to remain counsel of record in this case.

Respectfully submitted,

 *s/G. John Cento*
G. John Cento
Christopher T. Lane
CENTO LAW, LLC
The Emelie Building
334 North Senate Avenue
Indianapolis, IN 46220
(317) 908-0678
cento@centolaw.com

37

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been filed electronically on the 10th day of April, 2015. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing.

William R. Brown, Esq.
Camille R. Nicodemus, Esq.
Schuckit & Associates, P.C.
<u>wbrown@schuckitlaw.com</u>
<u>cnicodemus@schuckitlaw.com</u>

*s/G. John Cento*
G. John Cento